is dredge spoils from submerged land that was deposited on nearby submerged land. It is not an improvement, it is not construction, it is not adjacent to a military installation, it is not fill, it is not accretion, it is simply dredge spoils. And the purpose of 1313A was to protect government installations that had already been made to which certain additions, fill, bulkheads had been added. If you look at pages 9 to 14 of our reply brief, it lays out in detail with quotations from Attorney General Brownell explaining the purpose of the Submerged Lands Act, which was to give submerged lands to the states and make sure that the states were entitled to those submerged lands. And then the question was asked, well what happens to properties that the military has, that have installations in which they have added fill, they have added to the properties, and those additions were on submerged lands. Mr. Ruga, didn't we, I was on the panel in F.E.B. 1 versus the United States, and of course there's not a lot of law interpreting this exception to the Submerged Lands Act. But there are two cases out there, there's two cases that we have to look at. I was on the panel, I didn't write the opinion, Judge Abel wrote the opinion, I signed on to the opinion. But we've got F.E.B. 1 versus the United States, and also California versus the United States. So didn't we hint, but didn't we hint, and the Supreme Court hint in both of those cases that ownership should go to the United States? They hinted it in the specific facts of those cases, I'm talking about California 2 to begin with. But California 2 was an accretion case, and this court in the opinion of which you signed on, F.E.B. 1, said that this was dicta, the California decision was dicta. With regard to accretions. So that case doesn't carry any weight here, certainly not the weight the government has tried to assign to it. And in a footnote... Why is accretion different? Accretion happens naturally. In California 2, what happened is there were government jetties, and as the tides came in and came out, that land then grew, but it was adjacent to the government property already. So that's an accretion as opposed to a deposit of dread spoils in the middle of the... Not quite the middle of the sea, but certainly a deposit of dread spoils offshore. But the second point, because Your Honour is obviously correct, footnote 9 in F.E.B. 1 talks about something else that helps the court's thinking in terms of the use of the land. But the trouble is, in footnote 9, you were talking about something, but it was not an improvement. And the bottom line is that F.E.B. 1 said that we do not really make a decision on this. In fact, they leave the door open for exactly what this case is. They said that the ownership is still a matter to be decided. So F.E.B. 1 is not decisive in this case. We've got to interpret this language. You might have a stronger argument if Congress had put the word future in front of the word use. Well, future use... Well, they didn't, but the truth is you have to read it as future use, because for use... I think the argument that the government is making is that, quote, this is storage. This is not storage. They just dumped the spoil there. I mean, I think that what's critical here is that this has never been used. It's never been thought to be used in F.E.B. 1. Aren't you using it? I mean, this seems to be the reasoning of the district judge. It's being used to store dredging material. Why isn't that a use? Because it was not stored. It was simply dumped. There's no evidence, there's no claim, nothing's ever been said that they had any purpose in doing this other than to deposit the dredged spoils. So this is not a storage case. Beyond that, if one looks at the history of this, the government took some adjacent land, adjacent dredged spoils, to use for certain purposes, and they went and they condemned it. In fact, we have in our appendix and in our brief, Judge Dyer approved the taking of certain properties. They even had listed wisteria as something they wanted to take, but it cost too much, and so they moved to some other areas where dredged spoils were. And if you look at Judge Dyer's final judgment on the map of the area, it shows wisteria as privately owned. It has never been used. And so if you store something, if you're going to have something that you claim is yours, there is some indication of use. Here, the only use that's ever been made of wisteria is when they leased it from FEB for some Navy training. It has never been used. So if you look at all the nos, all the nevers, it's not fill, it's not construction, it's not an improvement, and the purpose of the statute is critical here because that's the purpose of the statute, for its own use. And when you look at the list, and the list that was provided by Admiral Nunn is very helpful because, and that was referred to, I think, 2 in FEB 1, and it talks about the heading of the list because the question was asked, what is it that you want to protect? And Admiral Nunn provided this list to Congress, and this list is the genesis of the 1313A exception. And here's the style of the list. List of improvements made by the Navy at naval activities in which the improvements have been added beyond mean low water and into the marginal sea. Now, Wisteria Island is not beyond mean low water. Mean low water is where the tide comes in, comes out, and there's a little sandbar, and it then becomes part of the picture there. This is a whole different picture. So this is not an improvement. Dread spoil is not constructed. And what was the list that was given? Fill, bulkheads, piers, structures have been constructed beyond the low water line. Wisteria is not that. So this language for the government's own use is clear that Wisteria does not fit into that description. And I'm sorry, Judge Rose. That's okay. I have a couple of questions. Yes. First one, with respect to the point you made a moment ago about the four different pieces of land that were condemned, but Wisteria was not. Yes. If they did not have to be condemned in the first place, that is, if the United States owned them all along, then does that really matter? Well, what matters is it reflects the fact that they didn't think that they owned it because they didn't own it, and if they wanted to have any use for it, they were going to have to go through the taking process. So yes, it is an important fact. Except for the fact that, I mean, sometimes the government, or actors on behalf of the government make a mistake, and if there is evidence that they owned it before that, or at the time that they sought the condemnation, then is there some way that your clients can use that to say that they're held to that? Well, and we are saying that they recognize they did not own it. They were not using it, and the only way they could use it would be to condemn it, and then when the price was too high from the appraisal, they moved to some other pieces of spoiled land. And so yes, but this is part of the whole picture. If one looks at the whole picture here, there is no evidence. There's no map of the United States, a naval map that shows Wisteria Island as government property. What do you say in response to the number of documents there are in the record? For example, the executive order, I think it's 4060, and some other materials that are in the record, a number of letters and things of that nature, that the government relies on to say that it was theirs, it was always theirs, it was theirs from the time that Spain gave the United States Florida. What do you say to that? I say the Submerged Lands Act took it away. The 1311 said submerged lands are now the state's lands. Okay, and then the second question, which I guess is now by now the fourth question. The government relies, I think, significantly on the notion or the principle that it needs to be expressed clearly when the government makes a land grant. And so would you agree that in order for your client to prevail here, we need to find that there's no ambiguity in the statute? There is no ambiguity in the statute. Right, so you would agree? Yes, the statute says what it says. It's how you apply the statute to the situation in this case. And so we have obviously brought in Brian Garner and Barry Schein in terms of linguistics, but for its own use, the common meaning is to be used. And there's not one scintilla of evidence that they used except to lease it from our people. And everything that they did, it doesn't show on any map. It doesn't show the contemporary view of it by the people who are working for the government was that we can't say this is for our own use. And that's what led to the takings effort. So I think you're right that everybody agrees that it says for its own use. I mean, clearly that's what it says. I think the question comes down to, what does for its own use mean? And so I guess what I'm asking you is, is it your position that it's clear what for its own use means? And if we conclude that it's not clear, it's not unambiguous as to what for its own use means, does that mean that your client loses under that principle? Or is there some reason that principle does not apply? No. For its own use means to be used. And their best argument is, this is storage. We're storing it. That's the use. But that is not a use on this record where there is no evidence of anything other than depositing the dredge spoils. So with the statute on its face for its use, looking at the legislative history in terms of what the purpose was of the statute, the answer is, this is FEB's property and has been for 60 years. And they've paid taxes on it for 60 years. And it was always recognized as that until 2011. And there was this letter that was sent that raised some question about it. Go ahead. I'm sorry. That's OK. So just to make sure that I understand, I want to make sure that I understand. If we find that for its use, and I'm not saying that we're necessarily going to do that. I'm going to have some questions for your friend on the other side as well. But I'm just trying to figure out the answers here. If we conclude that for its use is not an unambiguous grant of Wisteria Island under the Submerged Lands Act, then do you have a response to that? Is there some reason why your client could still prevail? Or in other words, I guess there are two ways. One would be there is an answer to that. The other would be that that principle doesn't apply. So I'm trying to find out what your position is on that. If I understand your question, Judge Rosenbaum, I think the principle doesn't apply in a situation like this where you have the words of the statute, and it was never used. There was no purpose for it other than to deposit dredge spoils, which is not within the ambit of the purpose of the statute. I think looking at the statute and the purpose of the statute that is critical in this situation. So I think either way you look at it, I think it's a terrible strain to look at it in the way the government is looking at it, that yes, this is there, and nothing's happened with it, but it's ours. But 1311 gave all this property back to the state. And the deed, the trustee's deed that FEB has is the product of the state's ownership of the land, if that helps. I'm not sure I answered your question completely, but I was a little confused, to tell you the truth. OK, well, I apologize. Let me try it this way. Are you suggesting that there is not validity to the principle that any grant of land that the government may give must be clear and unambiguous? Yes, it must be clear and unambiguous. And it is clear and unambiguous here in terms of what the grant is. I got you. Thank you very much. Not only that, isn't there some law out there that says that there's a presumption that we construe land grants in favor of the government? Yes, but 1311 is the government speaking, saying we're giving it all to the states except for this. So I'm not saying this is a land grant. What I'm saying is the land has already been granted by 1311, vitiating any kind of prior situation. And now they say, but there's an exception. And that takes me back right to the beginning of my argument. The exception is if it is something that is part of an adjacent thing to an installation, a military installation, that's what they wanted to protect. There is not a hint, not a word, not a scintilla of evidence that something deposited, dredge spoil, is incorporated in the 1313A exception. All right, thank you. And you've reserved some time for rebuttal. Thank you. And Mr. Gray, you may argue for the government. May it please the court, Michael Gray on behalf of the United States. I want to pick up on that last line of questioning Judge Rosenbaum. I understand, I think, the import of the answers there to be that the court does have to find that there's no ambiguity in the statute in order to rule for the other side. The problem for the other side is that this court has already said that the statute is ambiguous in this very situation. The court said in FEB1 that the circumstances here of the United States dredging and depositing the spoil on this land for the Navy's benefit and use hews closely enough to the statute that it is not a clear and unequivocal abandonment of the United States claim to title. The question in this case would be whether it is a clear statement of conveyance from the United States to the state of Florida. And the court has already said that the statute on this point is not clear. At least, at the very least, it's used closely enough to the statute that it is not a clear conveyance. And that means, under the concession from counsel, that judgment must be affirmed. What is the government using the island for? Well, I mean, I think, as this court said before, and I'll answer the question first and then back up a little bit, but I think if you're looking for a current use, the current use is that that's where the spoil is. When you store spoil . . . But how is that using it? I mean, what are you storing it for? You don't have any intention of ever using . . . There's no intention that is in the record of the government to ever use the spoils. I don't think that's correct. I think depositing the spoils and leaving there is using the land to store the spoil. It's a continuing use. The spoil is still there. That is itself a use. And this court said so in the last case, that that is a sufficient use. Let me ask you this. So you would agree that in addition to having been built or filled in or whatever, it has to be for the government's own use. That's a separate and second requirement. You would agree with that. Is that fair to say? I think that, yes, in the sense that we would agree that the important word . . . They focus on the word use. The important word is . . . It's a phrase, own use. And when the United States deposited this land, it did so for the Navy's use and not for anyone else's. The California II case talks about, and the legislative history supports the idea, that the relevant question here is that the United States should get the benefit of its . . . They deposited the land for navigation purposes. Well, there's evidence in the record that the area where this was deposited was Franklin Bank, which was viewed as a barrier . . . Right, but that area . . . Yes, that was one purpose, but they chose a soil location. Not to put a building, a military installation on it or to store ammunitions. Well, the statute doesn't require any of that. I mean, under the plain language of the statute . . . But, counsel, we just discussed how there is . . . It says built or filled in and for its own use, which are two different things. And so, doesn't there have to be something besides filled in in order to get to for its own use, in order to satisfy that aspect of the statute? Well, no, because it could have been filled in for . . . Under the . . . The United States could have filled in land under a permit for a state or for a private party, but this was done for the Navy's own use. So, this was work done by the United States for the United States. And under California II, the court said that this respective sovereign should get the benefit of their own work. And if you look back up and look at the history here, I mean, this is an area that the United States obtained in 1819. The record is replete with reservations of this particular area for military use. It's included in the legislative history, identified as Key West, fill at Key West. This was within the bounds of that under the executive order. What do you say, though, in response to FEB's argument that there were four specific pieces of land in that same area that were condemned and that were separately identified and Wisteria Island was not one of them? I mean, why doesn't that reflect, I guess, two different things. Number one, does that reflect that the United States didn't own the property in the first place, so it wasn't the United States' property to give up under the Submerged Lands Act? And two, if not, and first, why, but if not, then doesn't it suggest that the United States was not using Wisteria Island? I don't think it suggests either of those things. I mean, in response to the first question, there's been no, it's been undisputed in this case that the United States owned Wisteria, owned the land that makes up Wisteria Island until the passage of the Submerged Lands Act. Council responded to the same question with that answer earlier. So there's no question of the United States' prior ownership in this case. And just as a general matter, as the court has said before, the officials of the United States can't give up title to land. The United States often takes actions to avoid disputes. The United States may have decided it was gonna be cheaper to condemn these lands than to litigate over whether it had title to them. And out of deficiency, went ahead and condemned those other lands. It doesn't say anything about what the United States' ownership is or what the correct interpretation of this statute is. The question is, did the United States convey in clear language when it passed the Submerged Lands Act in 1953? Later condemnations of other lands don't have anything to do with that statutory question. So let me ask you this then, going back to what you said a little bit earlier. In your view, any time the United States does dredging and deposits the soils within three miles of the state line, or if it did it obviously before the Submerged Lands Act, then necessarily all of those things satisfy the exception under the Submerged Lands Act? Not just Wisteria Island, obviously. Right, but I think that's correct. I don't think there's a lot of these out there. I mean, it's been 70 years since the statute passed. But then again, you all didn't make a claim until almost 80 years later. I think that here the court doesn't have to go that far because we have the land itself being reserved under the executive order and then being included in the legislative history. And the spoil location, there's maps showing that they made a decision. It's not like they were just out there dumping spoil in the ocean and then claiming the lands. They made a decision of where they were going to dump the spoil for particular reasons. I mean, as I was saying earlier, where they dumped the spoil in this case was viewed as an important barrier because it was part of the Franklin Bank shoals and an important barrier for the protection of the island. Yeah, I did see in the record that there were several, I mean, obviously, this happened in the 40s during the war. And I did see in the record where there were several references to how this was a strategic location and it was important not to fall into private hands. But then, in 1951, we have the state offering it for sale and the government, although the government makes a claim, it sends a letter saying, hey, this is ours, it doesn't do anything further once the property is sold. And you all aren't relying on, or at least I didn't see anything in your arguments, relying on the fact that at some point in time the Navy considered this to be a strategic island or asset. So, I mean, how can we really rely on that? Well, I'm not sure that that's quite right. I mean, I think if you look at document 1-26 in the record, which is a letter from the Navy, an internal letter from the Navy in response to Florida saying it was going to sell the land. I mean, the Navy says there this is a strategic location, it would be bad if it fell into private hands. It can be used for, among other things, we're thinking of using it right now as a potential storage site for fuel. And so even there, and then the Navy did object to the claim, and I don't think it was incumbent... That's in the record? That's in this record? Yes, it's document 1-26. That the government intends to use it to store fuel in the future? There's a phrase in that letter that says we're looking at this place right now. I mean, this is in general, you know, they say, oh, there's no evidence of use. Well, if you look at what the Navy did, I mean, and there's that 51 letter. I want to be clear about this. There's a letter in this record that reflects that the Navy intends to use this island to store fuel in the future? I'll have to look at... I don't know that I would say intends to use it, but it does say this would be a good location, and we're looking at it. It may be a little less direct than it is. It does say we're looking at it as a potential storage space for fuel. But if you look, just, you know, their whole overall thrust here is that there was no... the Navy's never used this land. Well, and you have that letter in 1966. They looked at it as a potential site for spoil and decided to go somewhere else because of the confusion about ownership. We leased the land from then for SEAL training in the 2000s. These are all uses of the land that, had ownership been clear, the Navy could have made use of without any of those things. This document that you referred to, was it created before or after the lawsuit was filed? This lawsuit? It was in 1951, is the letter. It's a letter in response. It's an internal Navy letter. The Navy was made aware of Florida's offer to sell the land to a private party, and internally the Navy said we shouldn't let this happen for these reasons. This was even before the state sold the land to FEB. Yes, this was before the state sold the land at all and also before the Submerged Lands Act was passed, because it's 1951. Except, that, at that point, so the letter you're talking about, the internal letter. Yes. That's what I think, I don't know, I guess maybe I was talking, I think I was talking about the 1953 or 54 letter and I apologize, my computer, for whatever reason, is shut down so I can't call it up. That's the one I was talking about with the strategic considerations, but doesn't it have to have been, you all didn't really argue that. We have argued, I think in several places, that the Navy has always viewed this as a strategic location. I don't think we relied specifically on that document for this argument before. Can you point me to where you argued that it was a strategic location? I mean, and why then would, it sort of seems to be belied by the fact that it was sold off in 1951 to a private entity and has remained in private hands till now. I mean, if it's a strategic location that the government was worried about being in private hands, doesn't the fact that for the last 79 years, or however long it's been, been in private hands, I guess, yeah, about 70 years, doesn't that suggest that that's not really a use that it was concerned about? Well, let me say it this way. It doesn't particularly matter, right? Because the United States can't, as you've said, give up its title through these sorts of, through allowing it to remain in private hands and not choosing to litigate it. But that's kind of a different issue, right? The issue is whether it was reserved for its use, right? For its use. And so the fact of the matter is if the use was supposed to be strategic and, in fact, it did the exact opposite of what the strategy would have been, doesn't that kind of suggest that it wasn't really reserved for its use? I don't think the court even needs to get anywhere near that because that presumes that they're correct, that there's some future use required. And I don't think that that's correct under the plain language of the statute, which doesn't have any sort of future use or continuing use or anything else in it. It's inconsistent with the legislative history. It's inconsistent with California II, saying that in California II, you have jetties that result in accretion that's unused. The Navy had no intention ever, or whoever it was in California II, had no intention ever of using it. But the accretions seem a little bit different, right? Because the accretions are also attaching or created because of something that the government built, right? The government built those seawalls and the accretions are attaching because of that. And so, I mean, that's different here. I mean, the government had already done its work and now the accretions come and they attach. It's something new. But in this case, you all dredged the bay there and then created this island by depositing the spoils, but then nothing further happens. Well, but as this court... I mean, nothing happened with the accretions. And as this court said in the previous FEB case, the land here was created for a more functional use than those accretions because he actually did create the land. It's not just passive. Weren't the accretions attached to government land where there was a Coast Guard base or something? I mean, here, this is not attached to anything. Well, it's included within the bounds of the area that was reserved for the Navy in the executive order. So, I mean, it's part of that land that the Navy from 1845 to 1924 sought to reserve for strategic purposes. So the Navy placed spoil in land that it owned, that it thought was strategic, built up an island, and that's sufficient under the plain language of the statute, this court's previous decision, the California 2 case. Let me ask you one final question with respect to this. If we do not find that it was built for strategic reasons, can we still find that it was for its own use, and if so, how? Yes. I don't think you need to find anything other than that the United States created the land and it created it for its own use. It did not create that land. There's no evidence. There's no evidence that they created it for anyone else's use. It says for their own use. But it can be created for no one's use, right? I mean, how is it? What is use that is tied to the creation of the island? That is, what did it? We have already decided we have built, which is one requirement, and then for its own use, which is the other. So how does for its own use here differ from built? Well, they're using the land, the submerged land, to store the spoil, which this court said in the previous case was close enough to the language of the statute that it is not a clear conveyance to Florida, and that ends the matter. If it's not a clear conveyance, then title's retained by the United States. We're not bound by that if it's dicta, though, right? If it's dicta, but it was not . . . The statements that this court made to resolve . . . We resolved that prior case on statute of limitations grounds. Correct, but the . . . And then Judge Ebel added some language, and so we didn't resolve the case on that ground at all. I would disagree with that respectfully, Judge Wilson, because the issue . . . You're saying that it's not dicta? Not the statement that this used closely enough, because the question in that case, their entire argument in that case, was that the statute of limitations reset because the United States conveyed the land under the Submerged Lands Act, and so the court had to interpret the act to resolve that issue, and the question was whether it was a clear and unequivocal abandonment of the United States' claim. The court had to resolve that in order to resolve the statute of limitations issue, and the court said it is not a clear and unequivocal abandonment of the United States' claim. The question here is a little different, because it's a merits question, which the court didn't resolve, I admit, but the question is, is it a clear conveyance, strictly construed in favor of the United States? If I understand the government's argument, then, the government can dump waste on land that otherwise belongs to the state, and the government then owns the land and doesn't have to do anything with it, doesn't have to use it at all. Well, this land was, at the time, owned by the United States. It's undisputed, so I don't think the court needs to go there. All right, okay. Thank you. All right, we have your argument. Thank you, counsel. Mr. Rogall, you've reserved some time for rebuttal? Yes, Your Honor. What about this document that he referred to, that the government referred to, that the government intended to use Wisteria Island to store fuel in the future? Well, I don't think that that document reflected that kind of statement. That was something that they may have thought about, but here's the answer to it. The answer to it is the Submerged Lands Act. The definition under 1301, this is 1953, not 1951 in some internal letter that the government writes, all filled in, made or reclaimed lands which formerly were lands beneath the navigable waters. That's what's involved, and 1311 says the United States releases and relinquishes unto said states and persons, et cetera, et cetera, except as otherwise reserved herein, and that's our exception, all right, title, and interest of the United States, if any it has, in and to all said lands, improvements, natural resources. So that is where we start, and then we have the exception, and the exception is, well, and that's why I think if you take a look at the Navy list of improvements, I mean, we can really zero in on this. That's what's so interesting. The Navy listed in that list of improvements, we have the whole thing reproduced at page 12 of the reply brief, and the title is improvements. Everything deals with improvements. They knew what they were doing, and they did leave the door open for fill bulkheads, piers, structures, which have been constructed beyond the low water line. That is not this, and so the government is trying to back into this argument by saying dread spoils, we put them there, and therefore they're ours. Everything belies that argument. So counsel, let me just make sure I understand. You're saying that even if the government built this Wisteria Island with the intention of using it to store fuel, let's just assume that for purposes of the hypothetical, that still wouldn't qualify under the exception under the Submerged Lands Act. Is that what you're saying? Let me understand it again, please. I'm sorry. It's okay. If the government deposited the spoils and created Wisteria Island with the idea that it would store fuel there sometime in the future. In 1941? Yes. It would make no difference. They would have given it away under the Submerged Lands Act. It was done, and it was never listed as anything, and the exchange between Attorney General Brownell and Secretary of Navy Anderson and Admiral Nunn makes it clear they want to deal with improvements that have been made, improvements that have been made. You would agree, then, that in order for us to arguably arrive at the interpretation that you are urging, that it is necessary for us to look at the legislative history. Yes. Yes. And I didn't argue this in my main argument, and I won't. I just want to remind the Court that we also have an objection to the summary judgment that was issued on the whole property. Thank you, Your Honor. All right. Thank you, Mr. Rogan. Mr. Gray.